**CORRECTED COPY – DESTROY ALL OTHERS**

# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————————

### No. ACM 40020

———————————————

### UNITED STATES
*Appellee*

**v.**

### Nicholas F. EMAS
Airman First Class (E-3), U.S. Air Force, *Appellant*

———————————————

Appeal from the United States Air Force Trial Judiciary

Decided 21 June 2022

———————————————

*Military Judge:* Wesley A. Braun (arraignment); Matthew N. McCall (motions); Mark W. Milam.

*Sentence:* Sentence adjudged 23 October 2020 by GCM convened at Joint Base McGuire-Dix-Lakehurst, New Jersey. Sentence entered by military judge on 7 December 2020: Dishonorable discharge, confinement for 7 years, forfeiture of all pay and allowances, and reduction to E-1.

*For Appellant:* Major Ryan S. Crnkovich, USAF.

*For Appellee:* Colonel Naomi P. Dennis, USAF; Major Abbigayle C. Hunter, USAF; Major Brittany M. Speirs, USAF; Mary Ellen Payne, Esquire.

Before KEY, ANNEXSTAD, and MEGINLEY, *Appellate Military Judges*.

Judge ANNEXSTAD delivered the opinion of the court, in which Senior Judge KEY joined. Judge MEGINLEY filed a separate opinion dissenting.

———————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————————

ANNEXSTAD, Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of two specifications of sexual assault and one specification of rape in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1,2] The court-martial sentenced Appellant to a dishonorable discharge, seven years of confinement, forfeiture of all pay and allowances, and reduction to the grade of E-1.

On appeal, Appellant raises three issues through his appellate defense counsel which we have reworded: (1) whether the military judge erred by failing to instruct the panel that a unanimous verdict was required to convict Appellant; (2) whether the Government can prove that its failure to disclose that the named victim had been granted immunity was harmless beyond a reasonable doubt; and (3) whether the military judge erred when he allowed the Government to admit two video clips of the named victim's interview with investigators as prior consistent statements. Appellant personally raises three additional issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), which we have reworded: (4) whether the military judge abused his discretion by admitting Officer MC's body camera recording; (5) whether trial counsel committed prosecutorial misconduct during his closing argument; and (6) whether the Government's charging scheme amounted to an unreasonable multiplication of charges. With respect to issues (1)[3] and (6), we have carefully considered Appellant's contentions and find they do not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

Finding no error that materially prejudiced a substantial right of Appellant, we affirm the findings and sentence.

---

[1] Appellant was also acquitted of one specification of rape in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920, *Manual for Courts-Martial*, *United States* (2016 ed.) (2016 *MCM*).

[2] All references in this opinion to the punitive articles of the UCMJ are to the 2016 *MCM*. Unless otherwise noted, all other references to the UCMJ, Military Rules of Evidence, and Rules for Courts-Martial are to the *Manual for Courts-Martial*, *United States* (2019 ed.).

[3] *See United States v. Anderson*, No. ACM 39969, 2022 CCA LEXIS 181, at *50–57 (A.F. Ct. Crim. App. 25 Mar. 2022) (unpub. op.) (finding unanimous court-martial verdicts not required).

## I. BACKGROUND

Appellant entered active duty in the Air Force on 16 August 2016, and during the charged timeframe was stationed at Joint Base McGuire-Dix-Lakehurst (JBMDL), New Jersey. Appellant worked in the Explosive Ordinance Disposal (EOD) flight of the Civil Engineer Squadron. Appellant met Ms. KF on his first day with the unit.[4] At that time, Ms. KF was on active duty, stationed at JBMDL, and worked in the EOD flight with Appellant. While Appellant had talked with Ms. KF occasionally at work, the two did not know each other very well.

At trial, Ms. KF testified that both she and Appellant owned puppies, and that in September 2018, Appellant proposed that they meet up and let their dogs play together. At the time, Ms. KF lived in a house a short distance from JBMDL that had a fenced backyard. They arranged to meet at Ms. KF's house. That Saturday, 23 September 2018, Appellant arrived at Ms. KF's house with his puppy. Ms. KF lived with two male roommates, both active duty Air Force members. Both roommates were gone on this particular day and not due back until the following day. When Ms. KF originally made plans with Appellant, she had thought her roommates would be home.

Appellant was married, and Ms. KF testified that she assumed Appellant was bringing his wife with him. When Appellant showed up alone to her house, Ms. KF asked where his wife was; Appellant told Ms. KF his wife was sick or hurt, or words to that effect. As Ms. KF explained she was usually "either the only female or one of two females in" her unit, and had hoped Appellant would bring his wife with him so they could become friends. Appellant and Ms. KF sat together on the back porch while their dogs played in the backyard. Ms. KF offered Appellant a beer, and the two sat on the porch talking and drinking beer for a few hours. Ms. KF described the interaction with Appellant as "[j]ust having a conversation with my coworker, nothing really that seemed out of the ordinary, just . . . figured that it was nice to hang out with somebody." As it started getting dark outside, Ms. KF told Appellant that her plans for the night included dinner and watching television at home. Ms. KF invited Appellant to join her because "he was nice," and Appellant accepted her offer.

For the next few hours, Appellant and Ms. KF sat on the couch in the living room, ate leftover pizza, drank alcohol, and watched *The Office*, a comedy television show. Appellant and Ms. KF sat on opposite ends of the couch, with throw pillows between them. Appellant and Ms. KF were sitting about four-to-

---

[4] At the time of the offense Ms. KF was a noncommissioned officer who had three previous assignments. Since she separated from the Air Force prior to Appellant's trial we refer to her as Ms. KF in the opinion.

five feet apart. At some point in the evening, Ms. KF believed Appellant was too intoxicated to safely drive home; she told Appellant he could stay the night in either of her two roommate's bedrooms, or on the couch. The two other bedrooms were on the first floor of the house, and Ms. KF's bedroom was on the second floor.

Eventually, Ms. KF stopped drinking beer and switched to a large glass of whiskey. After consuming the whiskey, Ms. KF felt sick and dizzy, and soon thereafter walked outside and vomited in the front yard. Still feeling dizzy and sick, Ms. KF returned to the living room, told Appellant that she had vomited, and then walked upstairs to go to bed. Ms. KF got into her bed and went to sleep. Ms. KF awoke to Appellant standing next to her bed and placing a measuring cup filled with water on her bedside table. Without saying anything, Appellant knelt down next to her and stroked her hair and face. Ms. KF testified that she was "confused" by Appellant's actions. Ms. KF testified that she was lying on her side, and that while Appellant stroked her hair, he laid down on his side behind her in a spooning position. She further explained that the front of Appellant's body was touching the back of her body. Ms. KF stated that she was scared and froze when Appellant got in bed with her. She also testified in an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session, outside of the presence of members, that she had been previously inappropriately touched by a co-worker in a similar way.

Ms. KF testified that Appellant, while lying behind her, touched her shoulder and rubbed her waist, buttocks, and legs. He put his hands underneath her bra, and then inside of her shorts and underwear, such that he was touching the outside of her vagina. Ms. KF asked him what he was doing and Appellant did not respond. Ms. KF testified that she started to audibly cry, and when Appellant asked her if she "wanted his fingers" in her vagina, that she stated, "No." Despite Ms. KF's reply, Appellant penetrated Ms. KF's vulva with his fingers. Ms. KF stated that this lasted for a "few minutes." After penetrating Ms. KF's vagina with his fingers, and while still lying behind her, Appellant then asked Ms. KF if she wanted his "d[**]k." Ms. KF verbally responded, "No." Despite Ms. KF's answer, Appellant pulled down her shorts and penetrated her vulva with his penis. Ms. KF testified that it "didn't last very long" because "[t]here wasn't any lubrication." While this was happening, Ms. KF stated that she was still crying. Immediately after Appellant removed his penis from her vulva, and without saying a word, Appellant penetrated Ms. KF's anus with his finger. Appellant then asked if Ms. KF "wanted his d[**]k in [her] a[**]" and Ms. KF again verbally replied, "No." Despite Ms. KF's answer, Appellant brought his right hand to her throat and pulled her towards him, impeding her breath. Appellant then penetrated Ms. KF's anus with his penis. Terrified that Appellant was going to kill her, Ms. KF snapped out of her "frozen" state and attempted to physically escape. She testified that she threw her elbow back

toward Appellant's head, and then started flailing, trying to fight him off. Once Ms. KF began physically resisting him, Appellant got out of the bed and put his pants back on. Appellant then stated to Ms. KF, "What the f[**]k?" and Ms. KF replied, "You f[**]king raped me." After Ms. KF confronted him, Appellant left the room and went downstairs alone. Ms. KF remained in her bedroom crying.

A couple of minutes later, Ms. KF heard Appellant downstairs screaming. At first Ms. KF did not respond and tried to ignore Appellant's actions, but Appellant's screaming persisted, so she went downstairs to see what was happening. When Ms. KF arrived downstairs, she saw Appellant standing by the front door holding his wrist with blood on his hands. Appellant told Ms. KF that there had been an intruder in the house. Appellant walked out the front door. Meanwhile, Ms. KF could not find her dog, so she went outside on the front porch, found and collected her dog, went back inside the house, and locked the door. Ms. KF then heard Appellant yelling from the back porch area of the house. Ms. KF found Appellant lying on the back stairs, claiming that he had been stabbed. Ms. KF saw blood on Appellant's leg, but was unable to determine where the blood was coming from. Ms. KF told Appellant that she was going to call the police and reached into the pocket of his jeans to use Appellant's cell phone. When she reached into his pocket, she found a folding blade pocket knife. She then tossed the knife away from Appellant, retrieved his phone, walked back in the house, and locked the door. Appellant was still lying on the back stairs.

Ms. KF then proceeded to call 911. During the call, while uncontrollably crying and having trouble breathing, Ms. KF stated that she had been sexually assaulted. At different points she exclaimed to herself, "Why," "Oh my god," and "I can't believe this." Officers CL and MC from the Florence Township Police Department responded to the call. After arriving at Ms. KF's house, Officer CL knocked on the front door, but no one answered. Officer MC then thought he heard someone in the backyard. He walked around the side of the house, with Officer CL following closely behind him. The officers then found Appellant in the backyard, shirtless, bleeding, and holding his left hand. Appellant told the officers that he had chased two unknown men out of the backyard with a pocket knife. Both officers then had Appellant follow them to the back door of the house, which they found locked. The officers knocked on the door and Ms. KF, still on the phone with the 911 dispatcher, answered the door and let the officers in the house. When police officers made contact with Ms. KF, she was uncontrollably crying and having difficulty talking. Officer CL asked Ms. KF if Appellant was the suspect, and Ms. KF indicated he was. The officers then informed Appellant that they were taking him to the police station and that he would get medical treatment there. The officers escorted Appellant out of the

house, into a patrol vehicle, and took him to the police station, where he received first-aid treatment. Both officers were wearing body cameras that recorded their entire response to the 911 call.

Later that night, Ms. KF was taken to a local emergency room, where she received a forensic medical exam. During the exam, genital, vaginal, anal, and rectal swabs were taken from Ms. KF's body. A buccal swab, to serve as a known DNA sample, was also collected from Ms. KF. Ms. KF indicated to medical providers during the exam that she was experiencing moderate pain in her anus and that the pain started during the assault. At the time of the charged offenses, Ms. KF was menstruating and had a tampon inserted in her vagina during the assault. She did not remove or replace the tampon before going to the hospital. At the hospital, the tampon was removed, and collected as evidence. Also as part of the investigation, agents from the Air Force Office of Special Investigations (AFOSI) collected a buccal swab from Appellant, as well as swabs from his penis and both sets of fingers. They also collected fingernail scrapings and clippings from both of Appellant's hands. Additionally, the agents collected swabs of the blood found inside Ms. KF's house, and seized the jeans Appellant was wearing the night of the charged offenses—which had blood on the inside of crotch area.

The various pieces of evidence and swabs collected as part of the investigation were sent to the United States Army Criminal Investigation Laboratory for testing. DNA testing of the rectal swab, which was taken from inside Ms. KF's anus, revealed a single sperm confirmed with a very high likelihood to contain Appellant's DNA. Appellant's DNA from tissue cells was also found on Ms. KF's rectal and vaginal swabs. The testing also revealed that a swab of blood found on the inside of the crotch area of Appellant's jeans matched Ms. KF's DNA. Furthermore, Appellant's DNA was the only DNA found on the pocket knife. Finally, Ms. KF's DNA was found on the swabs taken from Appellant's right fingers and the fingernail scrapings taken from the same hand. At trial, the Government's DNA expert opined that it would take more contact than just touching to get someone else's DNA under one's fingernails. No DNA from an unknown source was found on the items tested.

## II. DISCUSSION

### A. Failure to Disclose Victim's Immunity

Appellant contends that the Government failed to specifically disclose the fact that Ms. KF was granted testimonial immunity prior to Appellant's court-martial. Appellant asks that we set aside and dismiss his conviction and sentence. We find that the error did not affect the outcome of the trial and that Appellant is not entitled to relief.

### 1. Additional Background[5]

As noted above, on 23 September 2018, police officers responded to Ms. KF's house, pursuant to her emergency 911 call in which she stated that she had been sexually assaulted. The responding officers spoke with Ms. KF, who volunteered that both she and Appellant had been drinking that evening. As a member of the EOD flight, Ms. KF was on call the night of the charged offense—meaning that if EOD personnel were needed for an emergency situation after hours, she was the person designated to respond. Because of her on-call status, she should not have been drinking alcohol that evening. The following day, AFOSI investigators interviewed Ms. KF. She told the investigators that on the night of the assault, she drank approximately three beers and a "rocks glass"-sized cup of whiskey. She further informed the investigators that she eventually vomited as a result of her alcohol consumption. Ms. KF's disclosures about drinking that night were all contained in the AFOSI report of investigation, which was provided to Ms. KF's commander.

On 21 September 2019, after the referral of charges against Appellant, Appellant's trial defense counsel made a specific request for any evidence of immunity provided to any witness. On 3 October 2019, trial counsel responded to the request and indicated no immunity had been granted to any witness.[6] On 13 November 2019, trial counsel disclosed to Appellant's counsel that Ms. KF was on standby on the night of the assault and therefore was not supposed consume any alcohol.[7] In response to this disclosure, trial defense counsel emailed the trial counsel and asked if Ms. KF had received any discipline for drinking that night; trial counsel responded that Ms. KF had not been disciplined. Trial counsel then sent defense counsel the standby letter listing Ms. KF as the on-call person on the night of the charged offense.

---

[5] Some of the facts in this section were received via post-trial declarations that were attached to the record. As these declarations pertained to issues raised by materials in the record that were not fully resolvable by those materials, they were considered by the court consistent with *United States v. Jessie*, 79 M.J. 437, 444 (C.A.A.F. 2020).

[6] Trial defense counsel also noted that their discovery request constituted "a continuing request." Although trial counsel did not specifically respond to this statement, trial counsel did note at various points that discovery was "ongoing" and that it would supplement its discovery responses as it received additional information.

[7] Trial counsel also stated, "The Government is aware of its ongoing obligations and will disclose any other information in the scope of *Brady* or *Giglio*." *See Giglio v. United States*, 405 U.S. 150 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

On 6 December 2019, approximately 11 months before Appellant's court-martial, a "Grant of Testimonial Immunity and Order to Testify" for Ms. KF was signed by the convening authority. A copy of the immunity letter was not, however, provided to Appellant's trial defense counsel. The record does not clearly indicate whether Ms. KF knew that she had been granted immunity prior to testifying at Appellant's trial.[8] During Appellant's court-martial, both trial counsel and trial defense counsel questioned Ms. KF regarding her alcohol consumption on the night of the assault. Ms. KF testified on direct examination that she drank three beers and a glass of whiskey on the night of the assault, and that she vomited due to the amount of alcohol she consumed. On cross-examination, Ms. KF admitted that she was on standby that night, and knew she was not supposed to consume alcohol while on standby, but drank alcohol anyway. Trial defense counsel continued his cross-examination by asking:

> [Trial Defense Counsel (TDC):] And you were actually on call that night, is that right?
>
> [Ms. KF:] Yes.
>
> [TDC:] You and another [S]enior [A]irman?
>
> [Ms. KF:] Yes.
>
> [TDC:] Meaning you could have been called into work at any point?
>
> [Ms. KF:] Yes.
>
> [TDC:] And as an NCO [(noncommissioned officer)] in your unit you were the team chief on call, is that right?
>
> [Ms. KF:] Yes.
>
> [TDC:] So then you said you drank three beers and some whiskey – – well, you said you drank three beers outside, is that right? And then at least one beer inside and some whiskey? You said you all watched – –
>
> [Military Judge:] Was there an answer?
>
> [Ms. KF:] Yes, sir. I nodded, but yes.

Trial defense counsel later questioned Staff Sergeant (SSgt) KM, who was Ms. KF's close friend, roommate, and also a member of the same EOD flight,

---

[8] A paralegal at JBMDL signed a memorandum, dated 27 January 2021, indicating that trial counsel informed Ms. KF's Special Victim's Counsel (SVC) of the grant of immunity. However, this memorandum does not specify the date on which trial counsel provided this information to the SVC, or whether or when the information was provided to Ms. KF.

about the standby program. SSgt KM testified that the job of the EOD flight was essentially to defuse bombs, and that the unit had certain members who were on standby status to address emergency calls off-base or after hours to handle unexploded ordinance. During closing argument defense counsel argued:

> [Ms. KF] is on the bomb squad, someone whose job it is to clear and make safe unexploded ordnances on base, off base, wherever it might happen and she needs to be ready to do that. And for whatever reason, this night, she's more interested in staying home and getting drunk with [Appellant] then [sic] she is staying ready to do her job. That should give you pause.

In closing argument, trial defense counsel also referred to SSgt KM's testimony on the matter of Ms. KF's drinking while on call: "[SSgt KM] did tell you that [Ms. KF] was on-call or that what it means to be an on-call EOD tech . . . and help you understand why it's not a good thing to get hammered drunk when you are on-call as an EOD tech." Trial defense counsel also used a slide presentation during closing argument; the slide addressing the evidence of what happened before the rape and sexual assaults noted that Ms. KF was drinking and also noted that she was on call.

At the time the immunity memorandum was signed, as well as at the time of her testimony, Ms. KF was a civilian.

### 2. Law

"The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *United States v. Coleman*, 72 M.J. 184, 185 (C.A.A.F. 2013) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).

In addition to this due-process right, "[a] military member also has the right to obtain favorable evidence under Article 46, UCMJ, 10 U.S.C. § 846 (2006), as implemented by [Rules for Court-Martial] 701−703." *Coleman*, 72 M.J. at 186–87 (footnotes omitted). The United States Court of Appeals for the Armed Forces (CAAF) has found that Article 46, UCMJ, as implemented, "provide[s] greater statutory discovery rights to an accused than does his constitutional right to due process." *Id.* at 187 (citing *United States v. Roberts*, 59 M.J. 323, 327 (C.A.A.F. 2004) (additional citation omitted)).

In evaluating disclosure issues, we employ a two-step analysis. First, we determine whether the information or evidence at issue was subject to disclosure. Second, if there was nondisclosure, we test the effect of the nondisclosure on the appellant's trial. *Roberts*, 59 M.J. at 325.

The CAAF has "adopted two appellate tests for determining materiality with respect to the erroneous nondisclosure of discoverable evidence." *Roberts*, 59 M.J. at 326 (citation and footnote omitted). "The first test applies to those cases in which the defense either did not make a discovery request or made only a general request for discovery." *Roberts*, 59 M.J. at 326. "Once the appellant demonstrates wrongful nondisclosure under those circumstances, the appellant will be entitled to relief only by showing that there is a 'reasonable probability' of a different result at trial if the evidence had been disclosed." *Roberts*, 59 M.J. at 326–27 (citations omitted). The second test applies to cases "[w]here an appellant demonstrates that the Government failed to disclose discoverable evidence in response to a specific request or as a result of prosecutorial misconduct." *Roberts*, 59 M.J. at 327. Once the appellant demonstrates wrongful nondisclosure under those circumstances, "the appellant will be entitled to relief unless the Government can show that nondisclosure was harmless beyond a reasonable doubt." *Roberts*, 59 M.J. at 327 (citation omitted). The CAAF has further stated that "[f]ailing to disclose requested material favorable to the defense is not harmless beyond a reasonable doubt if the undisclosed evidence might have affected the outcome of the trial." *Coleman*, 72 M.J. at 187 (citation omitted).

### 3. Analysis

The Government and Defense dispute whether a valid grant of immunity existed in this case, and whether Ms. KF was actually informed about the grant of immunity prior to testifying. For the purposes of deciding this assignment of error, we will assume without deciding that a valid grant of testimonial immunity for Ms. KF was signed by the convening authority, and that this grant of immunity was not disclosed to trial defense counsel prior to trial. Because trial defense counsel specifically requested information related to grants of immunity for any witness, we review this error under the heightened standard of harmlessness beyond a reasonable doubt.

For the following reasons, we conclude that the Government's failure to disclose the grant of immunity was harmless beyond a reasonable doubt. First, it is evident from the record that the Defense was aware of Ms. KF's misconduct for which the immunity was provided. In fact, the record demonstrates the Defense was aware of the misconduct months before trial. Armed with the knowledge of the misconduct, the Defense conducted an effective cross-examination of Ms. KF, during which trial defense counsel specifically questioned Ms. KF on her motive to fabricate based on her drinking while on call the night of the assault. Additionally, the Defense made use of this information during its closing argument, by again referencing Ms. KF's decision to drink while on call. Had the Defense been aware of the immunity, trial defense counsel may have been able to ask Ms. KF about said immunity. However, from the outset

of the investigation—and well before any immunity was provided—Ms. KF openly acknowledged that she was drinking while on call. This admission on her part would limit the effectiveness of any claim that immunity impacted her version of events.

Second, even if the Defense had knowledge of the immunity, we find that the Government would have been able to successfully rebut any claim that Ms. KF fabricated her rape and sexual assault claims to cover up her own misconduct. Here, Ms. KF's alcohol use was discovered because she called 911 to report the rape and sexual assaults. Ms. KF then provided numerous statements, in multiple settings, that were substantially consistent with her testimony at trial. In fact, her statements to law enforcement were not only consistent about the events, but were also consistent about the amount of alcohol she consumed. This information rebuts a claim of motive to fabricate and also rebuts the argument that Ms. KF changed her testimony at trial as a result of being granted immunity.

Third, because Ms. KF had separated from the Air Force by the time of Appellant's court-martial, we conclude that Ms. KF's immunity from prosecution for a purely military offense would have had little or no impact on her trial testimony.

Finally, we find that the strength of the Government's case supports our conclusion that the requested information would not have affected the outcome of the trial. Here, we note that Ms. KF's testimony was consistent with prior statements she made during the investigation. We find that her testimony at trial was supported by additional evidence admitted at trial, including her emotional 911 call following the assault and the police body-camera footage that captured her frantic state immediately following the assault. We also note Appellant's strange behavior on the night of the assault belies his professed innocence. Here, both the physical and DNA evidence admitted at trial directly contradict Appellant's numerous inconsistent statements about a possible intruder assaulting Ms. KF. Lastly, we note that the DNA evidence admitted at trial directly supports Ms. KF's claims that the perpetrator of the rape and sexual assault was Appellant.

For these reasons, we find that the failure to disclose Ms. KF's immunity did not affect Appellant's trial. Therefore, we conclude the failure to disclose this information was harmless beyond a reasonable doubt.

### B. Ms. KF's Prior Consistent Statements

Appellant claims that the military judge erred when he allowed the Government to admit two video clips of Ms. KF's interview with investigators as prior consistent statements under Mil. R. Evid. 801(d)(1)(B)(ii). Specifically,

Appellant contends that the Government impeached Ms. KF with its own witness and documentary evidence, and that the military judge generally misunderstood the law on admitting prior consistent statements. We are not persuaded by Appellant's arguments and determine that no relief is warranted.

### 1. Additional Background

Shortly after the incident, on 23 September 2018, Ms. KF was taken to the hospital and a sexual assault examination was conducted. In addition to gathering the forensic evidence detailed above, Ms. KF also discussed some of the details of assault with a sexual assault nurse examiner during the exam. The nurse examiner prepared a report documenting the examination, which included statements Ms. KF made to the nurse examiner. The following day, AFOSI agents interviewed Ms. KF, and that interview was video-recorded.

The first witness to testify at trial was Ms. KF. On direct examination, Ms. KF testified that Appellant penetrated her anus with his penis, and that while he was doing so, he "took his hand and he put it against the upper part of [her] throat and . . . pulled [her] neck towards him." She also testified that the force with which he was holding her was enough to prevent her from moving away. Ms. KF also explained that while this was happening, she "couldn't breathe properly." Ms. KF further testified that she started fighting back "when [she] started not being able to breathe" and thought she "might actually die" because she "couldn't breathe."

On cross-examination, trial defense counsel asked Ms. KF about different or inconsistent information she had provided to the nurse examiner on 23 September 2018. For example, trial defense counsel asked whether in that interview she had "denied all symptoms of strangulation" and denied changes in her breathing during the assault. Ms. KF responded that she did not recall if she denied the strangulation or breathing changes. Trial defense counsel then engaged in the following exchange with Ms. KF regarding her statements to the nurse examiner about Appellant penetrating her anus with his penis:

> [TDC:] Now you testified on direct that you were absolutely positive that his penis was in your anus, is that correct?
>
> [Ms. KF:] Yes.
>
> [TDC:] Absolutely positive?
>
> [Ms. KF:] Yes.
>
> [TDC:] And you also testified, again, you just said it that you were seen by a nurse [examiner] that night, is that right?
>
> [Ms. KF:] Yes.

[TDC:] And you gave an account of specifically that encounter with the anus, is that right?

[Ms. KF:] Yes.

[TDC:] And it was important to be honest that night, is that correct?

[Ms. KF:] Yes.

[TDC:] Just like it is important to be honest now, is that right?

[Ms. KF:] Yes.

[TDC:] And you were actually there seeing the nurse [examiner] for medical treatment, is that right?

[Ms. KF:] Yes.

[TDC:] And so the nurse [examiner] you told her that he tried to but he couldn't, is that correct?

[Ms. KF:] That is accurate. There was no lubrication so he was unable.[9]

After Ms. KF testified, the Government presented testimony from the sexual assault nurse examiner. During her testimony, and without objection, the Government admitted the report she prepared detailing Ms. KF's sexual assault examination. The report was also published to the court members during her testimony. The report, on its face and after trial counsel's direct examination, indicated that Ms. KF's statements to the nurse examiner were generally consistent with Ms. KF's testimony at trial—specifically, that Appellant put his hand on Ms. KF's neck from behind to restrain her during the sexual assault. The report contains three possible references to Appellant strangling Ms. KF. First, in the history Ms. KF provided to the nurse examiner, Ms. KF told the nurse examiner that while Appellant was behind her, he "put his hand on her throat to restrain her." Second, the report has boxes checked reflecting that Ms. KF was physically restrained by hands during the assault. Finally, the

---

9 On redirect, Ms. KF was asked by trial counsel to explain to the members what she meant by "there was no lubrication." Ms. KF testified, "I remember that he got it in and then was attempting to move in and out but it – – it wasn't working." Trial counsel then asked Ms, KF, "Couldn't move it in and out. When you say he got it in, can you just describe how far in?" Ms. KF responded, "Not – – not very. The tip, maybe a little more." Finally, trial counsel asked Ms. KF, "So the tip of his penis penetrated your anus, it went in even though it wasn't very far and he tried to penetrate more but couldn't, is that accurate?" Ms. KF responded, "Yes."

report contains a strangulation worksheet that indicates Ms. KF informed the nurse examiner that strangulation occurred from behind her, with one hand.

During cross-examination of the nurse examiner, trial defense counsel questioned her on possible inconsistent statements that Ms. KF made to her. Specifically trial defense counsel asked whether Ms. KF had mentioned any breathing changes during the strangulation, and she responded that Ms. KF had not. Defense counsel also elicited testimony from the nurse examiner that she obtained the history of the sexual assault directly from Ms. KF. Trial defense then confirmed that Ms. KF told the nurse examiner that Appellant "tried to put his penis in [her] butt but couldn't."

Following the testimony of both Ms. KF and the nurse examiner, the court held an Article 39(a), UCMJ, session regarding the Government's desire to introduce two clips from Ms. KF's video-recorded interview with AFOSI as prior consistent statements. The first clip was approximately one minute and 23 seconds in length. In this clip, AFOSI agents asked Ms. KF if Appellant had "choked," restrained, or struck her during the assault. Ms. KF responded that Appellant "choked her" after he penetrated her with his fingers, and explained that Appellant was still behind her with his hands on her throat. An agent then asked Ms. KF if her airway was closed off, and Ms. KF answered, "Yeah, and I wasn't comfortable. And that's part of the reason that I started hitting him." The first clip ended with the agent recounting his understanding of the order of events as described by Ms. KF, and Ms. KF clarifying that Appellant was only strangling her when his penis was penetrating her anus—not when he was penetrating her vagina. The second clip was approximately ten seconds long. In this clip, Ms. KF stated to investigators that Appellant penetrated her anus with his penis.

During the Article 39(a), UCMJ, session, the Government argued that trial defense counsel had opened the door to these prior consistent statements by eliciting testimony about purportedly inconsistent statements Ms. KF had made to the nurse examiner—specifically, statements about whether Appellant actually penetrated Ms. KF's anus with his penis, and whether Appellant cut off Ms. KF's airway or impeded her breathing while strangling her. Trial defense counsel objected to the admission of both clips. Trial defense counsel argued that it was the Government's introduction of the nurse's report that had raised the inconsistencies with Ms. KF's testimony, and further, that the clips were not consistent with Ms. KF's testimony at trial. The military judge, over defense objection, ruled that both clips were admissible as prior consistent statements of Ms. KF under Mil. R. Evid. 801(d)(2)(B)(ii). In reaching his ruling, which was done on the record, from the bench, and without actually viewing the two clips, the military judge also relied on the United States Army

Court of Criminal Appeals' reasoning in *United States v. Finch*, 78 M.J. 781 (A. Ct. Crim. App. 2019), *aff'd*, 79 M.J. 389 (C.A.A.F. 2020).

**2. Law**

We review "a military judge's decision to admit evidence for an abuse of discretion." *United States v. Frost*, 79 M.J. 104, 109 (C.A.A.F. 2019) (citing *United States v. Humpherys*, 57 M.J. 83, 90 (C.A.A.F. 2002)). A military judge abuses his discretion if his findings of fact are clearly erroneous, his decision is influenced by an erroneous view of the law, or his decision is outside the range of choices reasonably arising from the applicable facts and law. *United States v. Kelly*, 72 M.J. 237, 242 (C.A.A.F. 2013). "[W]here the military judge places on the record his analysis and application of the law to the facts, deference is clearly warranted." *United States v. Flesher*, 73 M.J. 303, 312 (C.A.A.F. 2014) (quoting *United States v. Downing*, 56 M.J. 419, 422 (C.A.A.F. 2002)).

"Hearsay is an out-of-court statement offered to prove the truth of the matter asserted." *Finch*, 79 M.J. at 394 (citing Mil. R. Evid. 801(c)). "Hearsay generally is not admissible in courts-martial." *Id.* (citing Mil. R. Evid. 802).

A prior consistent statement is not hearsay and may be admitted as substantive evidence if three threshold requirements are met: (1) the declarant testifies at trial; (2) the declarant is subject to cross-examination about the statement; and (3) the statement is consistent with the declarant's testimony. *Id.* at 394–95 (citing Mil. R. Evid. 801(d)(1)(B)). Regarding the third threshold requirement, Mil. R. Evid. 801(d)(1)(B)(i) and (ii) provide that the prior consistent statement must also be offered (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper motive in so testifying; or (ii) to rehabilitate the declarant's credibility as a witness when attacked on other grounds. *See also United States v. Ayala*, 81 M.J. 25, 28 (C.A.A.F. 2021).

As the CAAF has recently stated:

> The plain text of [Mil. R. Evid.] 801(d)(1)(B)(ii) indicates that a prior consistent statement is admissible when it serves "to rehabilitate the declarant's credibility as a witness when attacked on another ground." The rule's mention of "another ground" refers to one other than the grounds listed in [Mil. R. Evid.] 801(d)(1)(B)(i): recent fabrication or an improper influence or motive in testifying. The rule itself does not specify what types of attacks a prior consistent statement under [Mil. R. Evid.] 801(d)(1)(B)(ii) is admissible to rebut, but the Drafters' Analysis lists "charges of inconsistency or faulty memory" as two examples.

*Finch*, 79 M.J. at 395 (citation omitted).

In sum, in order for a statement to be admissible under Mil. R. Evid. 801(d)(1)(B)(ii), it must satisfy the following five requirements:

> (1) the declarant of the out-of-court statement must testify, (2) the declarant must be subject to cross-examination about the prior statement, (3) the statement must be consistent with the declarant's testimony, (4) the declarant's credibility must have been "attacked on another ground" other than the ones listed in [Mil. R. Evid.] 801(d)(1)(B)(i), and (5) the prior consistent statement must actually be relevant to rehabilitate the witness's credibility on the basis on which he or she was attacked.

*Finch*, 79 M.J. at 396.

To meet the criteria for a prior consistent statement, a declarant's out-of-court statement "need not be identical in every detail to the declarant's . . . testimony at trial." *Id.* at 398 (omission in original) (quoting *United States v. Vest*, 842 F.2d 1319, 1329 (1st Cir. 1988)).

If a military judge has erred in admitting evidence, the Government bears the burden of establishing that the erroneous admission was harmless. *Frost*, 79 M.J. at 111 (citation omitted). For preserved nonconstitutional evidentiary errors, the test for prejudice is "whether the error had a substantial influence on the findings." *United States v. Kohlbek*, 78 M.J. 326, 334 (C.A.A.F. 2019) (quoting *United States v. Fetrow*, 76 M.J. 181, 187 (C.A.A.F. 2017)). In conducting this prejudice analysis, we weigh four factors: (1) the strength of the Government's case; (2) the strength of the Defense's case; (3) the materiality of the erroneously admitted evidence; and (4) the quality of the erroneously admitted evidence. *Id.* (citations omitted).

We may affirm a military judge's ruling when the military judge reaches "the correct result, albeit for the wrong reason." *United States v. Bess*, 80 M.J. 1, 12 (C.A.A.F. 2020) (quoting *United States v. Robinson*, 58 M.J. 429, 433 (C.A.A.F. 2003)).

**3. Analysis**

Addressing Appellant's first contention—that the admission of Ms. KF's prior consistent statements was erroneous because the Government itself introduced both Ms. KF's trial testimony and her "inconsistent" statements to the nurse examiner—we find that the record sufficiently establishes that it was the trial defense counsel's cross-examination of Ms. KF that raised two potential inconsistencies. We also note again that the testimony of the nurse examiner was offered without objection.

With regards to the first video clip, Ms. KF testified on direct examination that Appellant "took his hand and he put it against the upper part of [her]

throat and . . . pulled [her] neck towards him." She further testified that the force with which Appellant held her was enough to prevent her from moving away. Ms. KF also explained that while this was happening, she "couldn't breathe properly." Ms. KF further testified that she started fighting back "when [she] started not being able to breathe" and that she thought she "might actually die" because she "couldn't breathe." On cross-examination, trial defense counsel attempted to point out a perceived inconsistency between Ms. KF's testimony and the statement she provided to the nurse examiner—specifically, by eliciting testimony from Ms. KF that she didn't remember whether or not she told the nurse examiner that her breathing was not impacted. Likewise, regarding the second video clip, Ms. KF testified that Appellant penetrated her anus with his penis. Again, during cross-examination, it was trial defense counsel who pointed out an inconsistency between Ms. KF's testimony during direct examination and the statement she made to the nurse examiner—specifically, by eliciting testimony that Ms. KF told the nurse examiner Appellant was unable to penetrate her anus with his penis because "[t]here was no lubrication."

Furthermore, we find that the record sufficiently demonstrates that the nurse examiner's report regarding the sexual assault examination was generally consistent with Ms. KF's testimony, and did not raise any inconsistencies concerning Ms. KF's testimony that Appellant put his hand on her neck to restrain her during the assault. As noted above, the report itself contains three notes or references to either strangulation or Appellant's hands on Ms. KF's neck. It was trial defense counsel who suggested—during cross-examination of the nurse examiner—that Ms. KF's testimony was inconsistent with what she told the nurse examiner. Here, trial defense counsel sought to capitalize on the point and use it to attack Ms. KF's credibility by suggesting Ms. KF was lying during her testimony about whether or not her breathing was impacted—since there was nothing in the nurse examiner's report about it—or that Ms. KF's memory was faulty regarding what she originally told the nurse examiner. We also note that prior to trial defense counsel's questioning, it appeared possible—based on what was in the report—that the statement regarding Ms. KF not being able to breathe was either left out of the report or perhaps that the nurse examiner did not ask that specific question during the examination. In sum, we find that trial defense counsel raised the inconsistencies during his cross-examination of Ms. KF and the nurse examiner.

As to Appellant's second argument—that the military judge erred in admitting the two clips due to his erroneous application of the law, and that the error was caused by the fact that military judge did not review either of the video clips prior to making his ruling—we first note that it is not clear from the record why the military judge did not review both video clips prior to issuing his ruling. However, the record indicates that counsel described the content of the

videos to the military judge and articulated how the content was consistent with Ms. KF's testimony. As our superior court has stated, "the proper course of action [is] for the military judge to review the proffered evidence before making an admissibility determination." *Finch*, 79 M.J. at 397. It is also not clear why the military judge did not more clearly articulate his findings and analysis on the record. It is evident that he did not take a recess to prepare his ruling. In general, the military judge's ruling was convoluted, and at times it appeared that he was thinking out loud. Because of these deficiencies, we do not benefit from a clear understanding of his reasoning and analysis, and therefore conclude that his ruling warrants little deference. However, after analyzing the statements and applying the five criteria for admissibility of a prior consistent statement, we find that the military judge correctly applied the law and ultimately reached the proper result.

We find that the first video clip (KF_1) meets all five criteria for a prior consistent statement under Mil. R. Evid. 801(d)(1)(B)(ii), and that the military judge's admission of the statements contained in that video clip was not an abuse of discretion. The first two criteria were not contested; it is clear from the record that Ms. KF both testified at trial and was subject to cross-examination. We also find the third criterion was met. Ms. KF testified during direct examination that Appellant placed his hand on her neck while he was penetrating her anus with his penis, and that it was difficult for her to breathe. On cross-examination, trial defense counsel elicited acknowledgements from Ms. KF that she understood how important it was to be honest to the nurse examiner following the sexual assault, and that she did not mention to the nurse examiner that her breathing was inhibited. We find that the short, tailored video clip offered by the Government—one minute and 23 seconds in length—was consistent with Ms. KF's testimony and sufficiently showed Ms. KF telling AFOSI agents that her airway was inhibited. The fourth criterion was also met, because trial defense counsel attacked Ms. KF's testimony on another ground outside of Mil. R. Evid. 801(d)(1)(B)(i). Again, trial defense counsel attacked Ms. KF's credibility by suggesting her trial testimony was factually different from her statements to the nurse examiner and thus was less worthy of belief—a point that trial defense counsel again made during his cross-examination of the nurse examiner. As for the fifth criterion, we agree with the military judge that the prior consistent statement contained in the first video clip was being offered to rehabilitate Ms. KF's credibility.

We also find the second video clip (KF_2) met all five criteria for a prior consistent statement, and that the military judge's admission of the statement contained in the second video clip was not an abuse of discretion. The first three criteria are again not contested. First, Ms. KF testified at trial. Second, Ms. KF was subject to cross-examination. Third, Ms. KF's statement to AFOSI

18

in the video clip was consistent with her testimony. Here, Ms. KF clearly testified that Appellant penetrated her anus with his penis, and the short video clip—ten seconds in length—shows Ms. KF telling AFOSI investigators that Appellant penetrated her anus with his penis. We also find the fourth criterion was established. Here, trial defense counsel again attacked Ms. KF's general credibility through the use of Ms. KF's prior inconsistent statement to the nurse examiner. He continued this general line of attack by again highlighting Ms. KF's inconsistent statement during his cross-examination of the nurse examiner. We also find the fifth criterion was met, because the second video clip was offered to rehabilitate Ms. KF's credibility.

In conclusion, we find that military judge did not abuse his discretion in admitting both video clips as prior consistent statements under Mil. R. Evid. 801(d)(1)(B)(ii). Additionally, even if we were to determine that the military judge abused his discretion, we would not grant relief. Specifically, we have weighed the four factors outlined in *Kohlbek*: the (1) strength of the Government's case; (2) strength of the Defense's case; (3) materiality of the evidence; and (4) quality of the evidence. 78 M.J. at 334. In doing so, we find that the error would not have had a "substantial influence on the findings," and that no remedy would be warranted. *See id.* at 334.

## C. Police Body Camera Video

Appellant asserts that the military judge abused his discretion when he overruled trial defense counsel's objection concerning the admissibility of Officer MC's body camera recording from Ms. KF's house on the night of the assault. Specifically, Appellant argues that the military judge erred in finding that Officer CL was around the scene at the same time as Officer MC, and Appellant therefore argues that Officer CL could not properly authenticate the recording from Officer MC's body camera. We disagree with Appellant's contentions and find no relief warranted.

### 1. Additional Background

Officer CL and Officer MC of the Florence Township Police Department responded to Ms. KF's house after she called 911. Both officers were wearing body cameras that captured video and audio during the response call. Officer CL testified at trial; however, Officer MC did not. The Government admitted recordings from both officers' cameras, by establishing the recordings' authenticity through the testimony of Officer CL.

Officer CL testified during an Article 39(a), UCMJ, session that was held specifically to address the admissibility of the body camera videos. Officer CL testified that the body cameras were department issued and that wear of the body cameras was required under the police department's policy. Officer CL stated that he knew that both of the cameras were working that night because

officers are required to do a check of the body cameras before they go on shift, and are not allowed to go on shift if the cameras are not working. Officer CL testified that the body cameras are activated and start recording when either the individual officer manually presses a button on the camera to activate the camera, or automatically when the emergency lights on the officer's patrol car are turned on. According to Officer CL, the police department's protocol requires that the cameras are activated and recording when an officer starts a call response, and continue recording until the end of the call or until the police officer is in another location—such as the police station—where there is already a camera recording events. Officer CL stated that the recordings are then saved on the body camera and that at the end of the shift, the officers are required to place their cameras in docks where the recordings are downloaded onto a server that is only accessible by evidence custodians. Officer CL testified that that he was able to review recordings from his own body camera as well as the recordings from Officer MC's camera. Officer CL testified that based on his review, both recordings were fair and accurate copies of the recordings from the officer's body cameras, that neither recording had been altered, and that they depicted what actually occurred.

Officer CL's testimony also established that both he and Officer MC arrived at Ms. KF's house at approximately the same time. He explained that but for a few moments when Officer MC went around the side of the house when he thought someone was in the backyard, both were within each other's line of sight at all times. Officer CL testified they "always try and not leave sight of each other" when responding to a call. Furthermore, Officer CL testified that he was in close proximity to Officer MC the entire time of the response.

Trial defense counsel did not object to the admission of the recording from Officer CL's body camera. However, he did object to admission of the recording from Officer MC's body camera. Trial defense counsel stated that he objected to the admissibility on the grounds that Officer CL's body camera did not capture what "was in front of" Officer MC, and that Officer CL could not "see what was a fair and accurate depiction of what was happening in front of [Officer MC] that night." The military judge ultimately overruled the objection on the record. The military judge then discussed his reasoning for his ruling at length. The military judge found the authenticity of Officer MC's body camera recording had been properly established by the Government—through Officer's CL's testimony, establishing that: the device was capable of recording; the operator of the equipment was competent; no changes, deletions, or additions had been made to the recordings; the speakers in the video were identified; and the statements made by those on the recording were voluntary.

**2. Law**

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. Clayton*, 67 M.J. 283, 286 (C.A.A.F. 2009) (citation omitted). Under the abuse of discretion standard, we review the military judge's findings of fact under the "clearly erroneous" standard and review his or her conclusions of law de novo. *Id.* (citation omitted).

To be admissible, evidence must be properly authenticated. Mil. R. Evid. 901(a). To satisfy the requirement for authentication, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." *Id.*

Mil. R. Evid. 901(b) provides a non-exhaustive list of evidence that satisfies the authenticity requirement of Mil. R. Evid. 901(a). For example, evidence may be authenticated through the testimony of a witness with knowledge "that an item is what it is claimed to be." Mil. R. Evid. 901(b)(1). Additionally, evidence about a "process or system" may be authenticated via "[e]vidence describing a process or system and showing that it produces an accurate result." Mil. R. Evid. 901(b)(9).

The proponent of the evidence bears the burden of establishing "a reasonable probability" that the evidence is authentic, and may meet its burden with direct or circumstantial evidence. *United States v. Maxwell*, 38 M.J. 148, 150–51 (C.M.A. 1993).

Once the proponent has made a prima facie showing that the item is what it purports to be, flaws in the authentication of the item "go to the weight of the evidence instead of its admissibility." *United States v. Lubich*, 72 M.J. 170, 174 (C.A.A.F. 2013) (internal quotation marks and citation omitted).

**3. Analysis**

Appellant essentially argues that Officer CL could not authenticate the recording from Officer MC's body camera. We disagree and find that the testimony of Officer CL was sufficient to establish that the recording from Officer MC's body camera was what it was claimed to be. Here, Officer CL testified he and Officer MC responded together to Ms. KF's house, that the two both remained at Ms. KF's house the entire time, and specifically that except for a few brief moments, the two remained in each other's line of sight the entire time. He further stated that he was able to review recordings from his own body camera, as well as the recordings from Officer MC's camera. He then stated in no uncertain terms that based on his review of both recordings, they were fair and accurate copies of the recordings from the officers' body cameras, and that neither had been altered nor changed. This testimony provided sufficient evidence to support the military judge's finding of fact.

Appellant's focus on the fact that both recordings are not exactly the same, because Officer CL and Officer MC were not always directly next to each other during the entire event, is misplaced. The Government is not required to present evidence overcoming every possible claim of inaccuracy. The proponent need only establish that evidence is what the proponent claims it is. Mil. R. Evid. 901(a). Here the basic foundational requirement was met, and we therefore conclude that the military judge did not abuse his discretion in admitting the recording of Officer MC's body camera.

## D. Trial Counsel's Closing Argument

Appellant contends that trial counsel committed prosecutorial misconduct during his closing argument. Specifically, Appellant contends that trial counsel used an inflammatory hypothetical where he asked the members to consider the same underlying facts, but where the named victim was a male instead of a female. Appellant alleges that this amounts to improper argument because trial counsel asked the members to decide Appellant's case on an inflammatory hypothetical—"a homosexual encounter"—rather than the facts adduced at trial. Appellant asks that we dismiss his convictions and the sentence. We disagree with Appellant's contentions, find only proper argument, and conclude no relief is warranted.

### 1. Additional Background

During his closing argument trial counsel argued as follows concerning a hypothetical involving two men:

> When you go back look at the judge's instructions on consent; a freely given agreement to the conduct at issue; a freely given agreement, all right. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance does not constitute consent. And all the surrounding circumstances are to be considered in determining whether a person gave consent or did not resist because of another person's actions.

> All right, let's pause for a moment. Let's pause for a moment and I just want you to think about this when you are deliberating. If [Ms. KF] was a man, was a male, and was at the house that night, would anybody even bat an eye over the facts that are before this court in evidence right now before the accused went up the stairs? Everyone would agree there's no consent. They are on the back patio, drinking beers. They go inside, they are drinking beer. They're drinking whiskey. They are watching The Office, which she described as a comedy. Some of you may be fa-

miliar with that show. It is not a horror movie. It is not a romantic movie. All right, they're watching The Office. At some point – – at some point she discusses with him, hey man, you can crash at my place if you want. My roommates are out of town. I've got two rooms. You can crash on the couch, whatever you want. All right, this is her EOD family member in a male-dominated career field and she's invited him over to her house. If these were two guys would anyone even bat an eye over that fact pattern? There's no consent to engage in sexual activity at that point.

And then [Ms. KF] goes outside and throws up. She vomits right out front and [Appellant] knows that. There's no consent at that point, right; a freely given agreement, right. So as you work through it, break it down phase by phase. Where's the consent? There's absolutely no consent in this case.

In his closing argument, trial defense counsel pointed specifically to the differences in rank and experience in the Air Force between Ms. KF and Appellant as factors that would make Appellant spending time alone with Ms. KF at her house, the two of them drinking together, and Ms. KF's offer to Appellant to spend the night, inappropriate. Trial defense counsel then argued that Ms. KF was potentially claiming the sexual acts between her and Appellant were nonconsensual in an attempt to rationalize the inappropriate situation of Appellant's presence at her house that evening. Trial defense counsel also specifically addressed the hypothetical posed by trial counsel. He pointed out that the facts established that it was not two males hanging out that night, but instead, a female and a male. Trial defense counsel also noted it "could've been two males and nobody would have batted an eye but it wasn't [two] males . . . . No, this – – this is what a lot of people might call a good date. This might be what a lot of people consider a romantic time."

In rebuttal, trial counsel again presented the hypothetical of two men in the situation of Ms. KF and Appellant, arguing:

Defense spent a lot of time character assassinating [Ms. KF]. It was inappropriate for her to have an Airman First Class over at her house. Is it really? An E-5? Like I said, if they were two men, an E-5 and an E-3, over at the house drinking some beers and whiskey and watching – – watching TV, is that really inappropriate? Or what does it matter?

Trial defense counsel did not object to either of trial counsel's references to the hypothetical involving two men.

**2. Law**

"We review prosecutorial misconduct and improper argument de novo and where . . . no objection is made, we review for plain error." *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citing *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018)). "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citation omitted). The burden of proof under a plain error review is on the appellant. *See United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citation omitted).

"Improper argument is one facet of prosecutorial misconduct." *Id.* (citation omitted). Prosecutorial misconduct occurs when trial counsel "oversteps the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense." *Fletcher*, 62 M.J. at 179 (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)). Such conduct "can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Hornback*, 73 M.J. 155, 160 (C.A.A.F. 2014) (quoting *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996)).

"A prosecutorial comment must be examined in light of its context within the entire court-martial." *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005) (citation omitted). "When a trial counsel makes an improper argument during findings, 'reversal is warranted only when the trial counsel's comments taken as a whole were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone.'" *United States v. Norwood*, 81 M.J. 12, 19 (C.A.A.F. 2021) (quoting *Andrews*, 77 M.J. at 401–02). "We weigh three factors to determine whether trial counsel's improper arguments were prejudicial: '(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction.'" *Andrews*, 77 M.J. at 402 (quoting *Fletcher*, 62 M.J. at 184).

The lack of a defense objection is "some measure of the minimal impact of a prosecutor's improper comment." *See United States v. Gilley*, 56 M.J. 113, 123 (C.A.A.F. 2001) (internal quotation marks and citation omitted).

**3. Analysis**

Citing the portions of the Government's closing argument quoted above, Appellant contends that trial counsel used an inflammatory hypothetical, with homosexual undertones, instead of arguing the facts that were in evidence. Because the Defense did not object at trial, the initial question is whether trial counsel's argument rose to the level of plain or obvious error. A review of trial

counsel's argument in context shows that immediately before posing the hypothetical, trial counsel recited, almost verbatim, the military judge's instruction on consent. Trial counsel then went on to state that the hypothetical showed that Ms. KF did not consent. In fact, trial counsel's argument focused on the interactions between Appellant and Ms. KF the night of the sexual assault, to illustrate that none of Ms. KF's actions—such as offering Appellant a beer, or a place to sleep on her couch because he was too intoxicated to drive—constituted consent. While Appellant asserts on appeal that trial counsel asked the members to envision hypothetical homosexual conduct, we find nothing in trial counsel's argument to support that assertion. Moreover, Appellant fails to explain, and we are at a loss to understand, how Appellant's conduct would be any more or less criminal by virtue of the gender of his victim.

Likewise, during his rebuttal argument, trial counsel used the hypothetical of two men to expressly rebut the Defense's argument that Ms. KF was trying to rationalize or avoid taking responsibility for an inappropriate situation of her own making. Again, placing this portion of the argument in context, trial counsel's comments explicitly referred to the Defense's closing argument, and again used the hypothetical as an attempt to illustrate the flawed logic in the theory posed by the Defense, namely, that Ms. KF falsely reported a sexual assault as an attempt to hide her inappropriate actions of drinking and hanging out with Appellant, who was junior in rank. Trial counsel used the hypothetical to illustrate that Ms. KF's actions were benign, and that she in no way consented to the charged conduct. We conclude that trial counsel's argument was fair comment based on evidence that was introduced at trial, and was not plainly erroneous.

Even if we were to assume error that was plain or obvious, Appellant would not be entitled to relief because he cannot demonstrate prejudice. After considering the three factors set forth by the CAAF in *Fletcher*, we conclude such an error did not materially prejudice Appellant's substantial rights. As to the first factor, we find the severity of the error to be slight. The fact that trial defense counsel did not object to any of these instances is some indication of their immateriality. *See Gilley*, 56 M.J. at 123. In addition, Appellant only points to two instances where trial counsel mentioned the hypothetical, with one of them being in trial counsel's rebuttal argument. Here, trial counsel's argument spanned approximately 20 transcript pages, and the rebuttal argument spanned another three transcript pages. The portions containing the hypothetical covered less than one transcript page. Moreover, the fact that Appellant was acquitted of one specification of rape indicates that the court members did not simply convict Appellant wholesale based on trial counsel's argument, but instead examined the evidence for each specification and determined Appellant's guilt on that basis.

With regard to the second *Fletcher* factor, because the Defense did not object, the military judge did not specifically address the allegedly improper argument. However, the military judge did provide other findings instructions that we may presume had some prophylactic effect. *See United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) ("Absent evidence to the contrary, this Court may presume that members follow a military judge's instructions."). Here the military judge instructed the court members that argument by counsel was not evidence, and that the members were to decide the issues based on the evidence and his instructions. More particularly, he instructed that the members, "If, *based on your consideration of the evidence*, you are firmly convinced that the accused is guilty of the offense charged, you must find him guilty." (Emphasis added). Not only is there no evidence the court members misused the evidence, but their mixed findings indicate they did not simply accept everything trial counsel argued. Furthermore, trial defense counsel cured any issue caused by trial counsel's use of the hypothetical by reminding the members that Appellant's case did not involve two men.

Finally, we find the strength of the evidence significantly favors the Government. The Government presented a compelling case, including the testimony of Ms. KF that proved both lack of consent and defeated any mistake of fact defense. Ms. KF's testimony was corroborated by the independent scientific evidence from both the sexual assault examination and the DNA testing, supporting Ms. KF's testimony that the sexual acts she alleged had indeed occurred. The Government also presented evidence concerning the 911 call, and the body camera recordings from Officers CL and MC, to show Ms. KF's frantic, inconsolable emotional state shortly after the charged assaults—all of which supported Ms. KF's testimony that the sexual acts occurred without her consent. We also note that the evidence presented that Ms. KF was menstruating—and had a tampon inserted in her vagina at the time of the assault—further demonstrated Ms. KF's lack of consent. Finally, Appellant's bizarre claims of an intruder in the house provided some evidence of his consciousness of guilt, which in turn undercut his theory of mistake of fact, and bolstered any conclusion that sexual acts were nonconsensual. In sum, we find no prospect that the allegedly erroneous argument played any substantial role in the court members' findings.

Weighing the *Fletcher* factors together and considering trial counsel's arguments in context, we are confident the court members properly convicted Appellant on the basis of the evidence alone.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and the sentence are **AFFIRMED**.

MEGINLEY, Judge (dissenting):

For the reasons I articulated in *United States v. Westcott*, No. ACM 39936, 2022 CCA LEXIS 156, at *108–42 (A.F. Ct. Crim. App. 17 Mar. 2022) (Meginley, J., dissenting) (unpub. op.), I would find Appellant was denied equal protection under the law and would set aside the findings without prejudice.* Notwithstanding this exception, I agree with the majority's analysis of the remainder of the issues.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court

---

* The majority opinion in *Ramos v. Louisiana*, ___ U.S. ___, 140 S. Ct. 1390 (2020), did not specifically address whether a judge's failure to instruct a jury on an accused's right to a unanimous verdict was a "structural error." A structural error is a defect "affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante,* 499 U.S. 279, 310 (1991). Courts have identified structural error "when a court is faced with 'the difficulty of assessing the effect of the error'" or when the error is so fundamental that "harmlessness is irrelevant." *United States v. Brooks*, 66 M.J. 221, 224 (C.A.A.F. 2008) (citations omitted). In Appellant's case, if the military judge's error was not structural, we could test the error for harmlessness. However, I would find the right so fundamental that testing for harmlessness is "irrelevant."